UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MATTHEW GUTWILL, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:16-cv-12191-IT |
| | * | |
| CITY OF FRAMINGHAM and | * | |
| KENNETH FERGUSON, Chief of the | * | |
| Framingham Police Department, | * | |
| individually, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

January 22, 2020

I.      Introduction

        Matthew Gutwill, a Detective with the Framingham Police Department, brought this

action against the Town of Framingham[1] and Kenneth Ferguson, Chief of Framingham Police

Department, in his individual capacity. Gutwill alleges that he was retaliated against for

reporting various issues at the Framingham Police Department to the Federal Bureau of

Investigation and to Framingham Town Managers, and that he experienced adverse actions in the

form of two investigations against him, paid administrative leave, and a five-day suspension.

Defendants moved for summary judgment on all claims. Framingham's Mot. Summ. J. [#91];

Ferguson's Mot. Summ. J. [#93]. For the reasons discussed below, the court GRANTS

Defendants' Motions for Summary Judgment [#91], [#93].

_____

[1] Framingham changed to a City form of government, effective January 1, 2018. See Notice of
Name Change [#37].

II.    Facts

The facts are drawn from Defendants' Statement of Material Facts ("Defs.' SOF") [#95],

Gutwill's Rule 56.1 Amended Statement of Additional Material Facts ("Pl.'s SAMF") [#129],

and Defendants' Response to Plaintiff's Rule 56.1 Statement of Additional Material Facts

("Defs.' Resp. Pl.'s SAMF") [#119]. Because Gutwill did not timely respond to Defendants'

Statement of Material Facts, see Elec. Order [#117], those facts are deemed admitted for the

purpose of this motion. Fed. R. Civ. P. 56(e); L.R. 56.1. The court takes disputed additional facts

raised by Gutwill in the light most favorable to him as the non-moving party.[2]

A.    *Background*

Gutwill was hired as a patrolman for the Framingham Police Department ("FPD") in

2004, and a few years later, became a Detective in the FPD's narcotics bureau. Defs.' SOF, Ex.

A ("Defs.' Ex., Gutwill Dep.") 122:6-22 [#95-1]; Defs.' SOF ¶¶ 1-2 [#95]; Defs.' Resp. Pl.'s

SAMF ¶ 3 [#119]. In 2008, Gutwill was assigned to the federal Drug Enforcement

Administration ("DEA") Task Force. Defs.' SOF ¶ 2 [#95].

B.    *Events Preceding the FBI Complaint*

On April 27, 2015, Gutwill participated in the stop and arrest of three people in a vehicle

as a result of information developed by a confidential informant ("CI") of FPD Officer Joseph

---

[2] Gutwill sought and obtained leave to file an Amended Statement of Additional Material Fact to correct citations in his original Statement of Additional Material Facts [#109-1] before Defendants filed their response. See Plaintiff's Motion for Leave to File [#113]; Elec. Order [#115]. However, Gutwill did not file the Rule 56.1 Amended Statement of Additional Material Facts [#129] until months later. Defendants' Response to Plaintiff's Rule 56. 1 Statement of Additional Material Facts [#119] therefore includes the citations from Gutwill's original Statement of Additional Material Facts [#109-1]. The court refers to Plaintiff's Rule 56. 1 Statement of Additional Material Facts [#109-1] and Defendants' Response [#119], except where the citations to the record differ as between the Rule 56.1 Amended Statement of Additional Material Facts [#129] and the original Statement of Facts [#109-1]. In those circumstances, the court cites both.

Godino. Defs.' Resp. Pl.'s SAMF ¶ 16 [#119]. Gutwill observed the suspect vehicle driving off the turnpike exit, and upon witnessing what Gutwill estimated to be a speeding violation, notified FPD Officer Brian Curtis, who was operating a marked police car. Defs.' SOF, Ex. E ("Gutwill's Suppl. Police Report") [#95-5]. The suspects were subsequently arrested, and both Godino and Gutwill drafted police reports. Id.; Pl.'s Opp'n, Ex. H ("Godino's Suppl. Police Report") [#111-8]. Godino's police report did not reflect that Gutwill relied upon information developed through Officer Godino's CI to identify the vehicle. Godino's Suppl. Police Report 2 [#111-8]. Rather, the report stated that two officers performed a motor vehicle stop "[b]ased on prior observations of the vehicle by Detective Gutwill." Id. at 2.

On April 28, 2015, Gutwill contacted the District Attorney's Office and informed them that a CI was involved in the investigation and had provided information leading to the arrest. Defs.' Resp. Pl.'s SAMF ¶ 26 [#119].

On September 1, 2015, Curtis and Godino testified at a hearing on a motion to suppress evidence obtained during the motor vehicle stop. Pl.'s Opp'n, Ex. I ("Tr. of Sep. 1, 2015 Suppression Hr'g") [#111-9]. Because Gutwill was unavailable that day, the hearing was continued to September 22, 2015, for Gutwill's testimony. Pl.'s Opp'n, Ex. A 222:19-24; 224:1-6 ("Pl.'s Ex., Gutwill Dep.") [#111-1]; Tr. of Sep. 1, 2015, Suppression Hr'g 52:11-15 [#111-9]; Defs.' Resp. Pl.'s SAMF ¶ 28 [#119]; Defs.' SOF ¶ 13 [#95].

On September 22, 2015, Gutwill spoke to the Assistant District Attorney ("ADA") prosecuting the case about his proposed testimony. Defs.' Ex., Gutwill Dep. 230:1-10 [#95-1]. See also Defs.' Resp. Pl.'s SAMF ¶¶ 29-34 [#119] (generally describing Gutwill's conversation with ADAs on September 22). Gutwill told the ADA and Police Prosecutor Sergeant Chris Montuori that he wanted to present his own testimony to the judge and "clear up the

misrepresentations that existed [from] Godino's testimony." Defs.' Resp. Pl.'s SAMF ¶¶ 32-33
[#119]. The ADA told Gutwill that if he testified, the judge was likely to find him untruthful
given Godino's contrary testimony, and accordingly, the District Attorney's Office was planning
to dismiss the case. Defs.' SOF ¶ 14 [#95]; Defs.' Ex., Gutwill Dep. 230:1-10 [#95-1].[3] While
Gutwill was at the courthouse, he obtained a copy of the transcript from the September 1, 2015,
suppression hearing. Defs.' Resp. Pl.'s SAMF ¶ 36 [#119].

The same day, Gutwill made a verbal complaint regarding Godino's testimony to Deputy
Chief Kevin Slattery, and to the assistant to the Chief, Brian Simoneau. Defs.' Resp. Pl.'s SAMF
¶ 37 [#119]; Defs.' Ex., Gutwill Dep. 238:16-21 [#95-1]. Gutwill told Slattery and Simoneau
about the ADAs' decision to file a *nolle pros* in the case and Gutwill's conversation with the
ADAs regarding Godino's testimony. Defs.' Resp. to Pl.'s SAMF ¶ 37 [#119]. During this
conversation, Slattery asked Gutwill if Gutwill would be interested in working in the evidence
room instead of the DEA task force, and Gutwill said "yeah, I'd be interested maybe." Defs.'
Ex., Gutwill Dep. 361:2-6 [#95-1]. Several days later, Simoneau and Slattery told Gutwill that
they would not accept the complaint about Godino verbally, and asked Gutwill to put it in
writing. Defs.' Ex., Gutwill Dep. 238:16-21 [#95-1].

On September 24, 2015, Slattery emailed Chief Ferguson about Gutwill's position in the
DEA. Defs.' Ex. N 1 ("Email Re: Gutwill's Position on DEA Task Force") [#95-14]. Slattery
wrote that he met with Gutwill on September 22, 2015, that Gutwill had "indicated . . . a couple
of times that he could use a break from his DEA assignment," and that Slattery was concerned
that Gutwill was "getting overwhelmed with everything he has going on in the task force and he

---

[3] The District Attorney's Office subsequently filed a *nolle pros* on the case. Defs.' Resp. Pl.'s
SAMF ¶ 35 [#119].

has been doing it for a long time." Email Re: Gutwill's Position on DEA Task Force 1 [#95-14]; Defs.' SOF ¶ 32 [#95]. Chief Ferguson responded that they should get a meeting "asap" with DEA leadership. Email Re: Gutwill's Position on DEA Task Force 1 [#95-14].

Gutwill submitted a written complaint about Godino on September 29, 2015. Defs.' SOF, Ex. G ("Written Complaint Re: Godino Matter") [#95-7]. According to the complaint, the ADA told Gutwill that "Detective Godino and Officer Curtis have already given testimony and if this case went any further there [is] a likely chance that the presiding Judge . . . would make a ruling that the Officers were less [than] truthful." Id. Gutwill also stated that Detective Godino had called the ADA "on the morning of the 22nd and asked the DA to drop the case." Id. When Gutwill objected that the case was being dropped, the ADA advised Gutwill that "they were dismissing the case to protect [Gutwill] from the court and a potential ruling that [he] perjured [himself]." Id. Gutwill reported further that the ADA subsequently stated that he had met with Godino and Curtis prior to their testimony, and that Godino had not told the ADA that an informant was the source of information that this vehicle was coming into town with a gun. Id. Gutwill reported further that Godino's hearing testimony was "less [than] truthful," and that he "misled the court" to believe that Gutwill was the source of the information, and "allowed a motion to suppress . . . to turn into a trial of [Gutwill's] actions and . . . truthfulness." Id.

Deputy Chief Slattery assigned Sergeant Montuori to investigate Gutwill's complaint about Godino's testimony. Defs.' SOF ¶ 19 [#95]; Defs.' SOF, Ex. B ("Slattery Dep.") 57:15-58:5 [#95-2]. Montuori's investigative report concluded that Gutwill's allegation that Godino failed to explain the use of a CI to the District Attorney's Office was unfounded, citing an interview with the ADA who had previously handled the case. Defs.' SOF, Ex. H ("Montuori Report") 2-3 [#95-8]. However, Montuori found that the testimony that Godino gave in court

regarding his reason for being on the road the night of the traffic stop was untruthful and misleading. Id. at 6. Accordingly, Montuori sustained Gutwill's allegations that Godino engaged in conduct unbecoming a Framingham Police Officer, and that he was not truthful. Id. at 2.

Lieutenant Victor Pereira, who had attended some of Montuori's interviews and had expressed to Chief Ferguson that he disagreed with Montuori's findings, was assigned to review Montuori's investigative report. Defs.' SOF, Ex. I ("Pereira Report") 1 [#95-9]. Pereira completed his review on December 21, 2015. Id. Pereira concluded that Montuori conducted a thorough investigation into the matter and that Pereira understood the conclusion that Montuori came to. Id. Pereira stated, however, that he disagreed with Montuori's findings, and that "the reputations of Detective Gutwill and Detective Godino, two good officers, are in question." Id. Pereira explained that "in this case, a matter as simple as whether someone was truthful is not so simple," and that "the incident must be looked [at] as a whole." Id. at 1-2.

In reviewing Gutwill's complaint and the transcript of the motion to suppress hearing, Pereira also found that "Gutwill, at the time of filing the complaint, had good cause to file the complaint" and that:

> [b]ased on the transcript of the testimony and the information Detective Gutwill had at the time, he had reason to believe that his reputation and his character for truthfulness were negatively impacted. The manner in which the testimony of Officer Brian Curtis and Detective Godino unfolded made it appear that Detective Gutwill had information from a confidential informant when that was not the case.
>
> . . .
>
> As there was no mention of the use of a confidential informant in any of the arrest reports and it appeared, at the time, that the District Attorney's Office was not notified of such use, coupled with the manner in which the September 1st testimony unfolded, it was not unreasonable for Detective Gutwill to believe that he would be viewed as being deceptive in his written police report and in the eyes of the court.

Id. at 2. Pereira determined, however, that Godino had provided information regarding the confidential informant to the original ADA on the case; that Curtis' testimony (rather than Godino's) may have led to the false impression that Gutwill had an informant and that Godino was unaware of that testimony when Godino testified; and that Godino's answers to the hearing questions identified by Montuori were responses to questions "general in nature" that allowed for "general responses." Id. at 3-5. Pereira concluded that Godino "was truthful and acted properly during the entirety of the course of events." Id. at 3.

On January 8, 2016, in a memorandum entitled "Framingham Police Department Internal Investigation Conclusion" addressed to Godino and Gutwill, Chief Ferguson made no mention of Montuori's conclusions, and no mention of Pereira's concern about the reputations of two good officers (Gutwill and Godino). Defs.' SOF, Ex. M ("Mem. Re: Internal Investigation Conclusion") [#95-13]. Instead, Chief Ferguson wrote only that the official investigation resulted in a finding that the allegations against Godino "were UNFOUNDED, meaning that the alleged act did not occur." Mem. Re: Internal Investigation Conclusion [#95-13].

### C.    Gutwill's Complaint to the FBI and United States Attorney's Office

On January 28, 2016, Gutwill and his attorney met with Agent Kevin Constantine, an agent at the FBI's Corruption Unit. Defs.' Ex., Gutwill Dep. 513:14-18 [#95-1]. In this meeting, Gutwill reported seven concerns: (1) FPD's handling of the Godino matter; (2) Framingham narcotics detectives' use of CIs; (3) detectives taking mementos from crime scenes; (4) Pereira's studying for a law degree while at work; (5) Simoneau's appearance in court for private clients during work time; (6) Deputy Chiefs' late arrival to work; and (7) improper "double-dipping." Defs.' SOF ¶¶ 60-67 [#95]; see also Defs.' Ex., Gutwill Dep. 513:19-540:19 [#95-1] (describing

issues raised to the FBI). The FBI did not open an investigation into any of these allegations. Defs.' SOF, Ex. Q 38:2-40:12 ("Constantine Dep.") [#95]; Defs.' SOF ¶ 70 [#95].

D.    *Further Events Prior to the Hiring of an Outside Investigator*

On January 29, 2016, Deputy Chief Slattery emailed DEA Special Agent-in-Charge Michael Ferguson ("SAC Ferguson"), Gutwill's supervisor on the DEA Task Force, to advise him that the FPD had decided to rotate Gutwill out of the DEA task force and reduce overtime spending "as discussed." Defs.'SOF, Ex. R ("Slattery-Gutwill Email Exchange") 4 [#95-18]. Slattery then forwarded the email to Gutwill. Id. at 3; Defs.' SOF ¶ 42 [#95]; Defs.' Ex., Gutwill Dep. 357:4-7 [#95-1]. Gutwill was not told when his rotation out of the DEA task force would occur. See Slattery-Gutwill Email Exchange [#95-18] (informing Gutwill of his removal without specifying when he would be removed). On February 4, 2016, Gutwill challenged the reason for his departure from the unit, and Slattery's characterization of Gutwill's prior conversation with Slattery. Id. at 3.

Also on February 4, 2016, Gutwill told the head of the Narcotics Unit, FPD Sergeant Sean Riley ("Riley"), that Gutwill had gone to an outside agency to report corruption within the Narcotics Unit. Pl.'s SAMF ¶ 99 [#129]; Pl.'s Opp'n, Ex. S ("Riley Notes") [#111-18]. According to Riley's notes of the meeting, Gutwill "[t]alked about an outside agency coming in to investigate the Narcotics Unit. Wouldn't say who. Only said it was prior to me." Riley Notes [#111-18]. Riley's notes also state that Gutwill made comments about "leaving the place in sha[m]bles so to speak or causing issues on the way out." Id.

On February 5, 2016, Gutwill went to Framingham's Assistant Town Manager James Duane ("Duane") and provided him with the "Godino file of information." Defs.' Resp. Pl.'s SAMF ¶¶ 101-102 [#119]; Pl.'s Op'n, Exhibit VV 1 ("James Duane Notes") 2 [#111-48].

Gutwill also raised other issues to Duane, including another incident involving potential misrepresentations of fact and general concerns about Simoneau's conduct as it relates to the FPD. James Duane Notes 3-4 [#111-48].

The same day, Gutwill called Chief Ferguson. Chief Ferguson took notes of the phone call, and later typed them up. Defs.' SOF ¶¶ 78-80 [#95]; Defs.' SOF, Ex. T ("Typed Notes from Feb. 5 Call") [#95-20]. During the call, Gutwill stated that he had gone to the FBI and reported corruption within the FPD. Defs.' Resp. Pl.'s SAMF ¶ 117 [#119]. Referring to lawsuits involving the department, Gutwill also told Ferguson that he had "been through this before; it leaves a wake of destruction. There are never . . . winners." Defs.' Ex., Gutwill Dep. 451:7-9 [#95-1]. Ferguson wrote down that Gutwill threatened to "blow the place up," or "turn it upside down," which Ferguson interpreted as a reference to causing internal controversy. Typed Notes from Feb. 5 Call 6 [#95-20]; Defs.' Ex. Y ("Notice of Investigation") [#95-25]. Chief Ferguson also wrote down that Gutwill stated that Deputy Chief Ronald Brandolini was recorded on a federal wiretap, Typed Notes from Feb. 5 Call [#95-20], but (accepting Plaintiff's version of disputed facts) Gutwill did not make this statement. Pl.'s Amended SAMF ¶ 122 [#129]; Pl.'s Ex., Gutwill Dep. 420:17-20 [#111-1].

E.     *The Hiring of Julie Moore and the First Two Investigative Reports*

On February 16, 2016, Human Resources Representative Dolores Hamilton contacted Attorney Julie Moore and advised her that Framingham wanted to retain her for an investigation, and that she thought the scope of services would include Gutwill's claims of retaliation, and Deputy Chief Slattery's claims that Gutwill is "creating a hostile work environment for him by

spreading lies about him." Pl.'s Opp'n, Ex. OO ("Emails Between Moore & Hamilton") 3 [#111-41].

On February 23, 2016, Hamilton and Chief Ferguson, on behalf of Framingham, formally engaged Moore. Defs.' SOF, Ex. V ("Moore Retention Letter") 1 [#95-22]. According to the engagement letter (and contrary to Moore's later representation regarding the February 16 phone conference), Moore was engaged solely to investigate Gutwill's claims that he was retaliated against due to his reporting regarding Godino's testimony at the suppression hearing. Moore Retention Letter 1-2 [#95-22]. The engagement letter noted that although "no written complaint exists" regarding the retaliation claim, "[Chief Ferguson] relayed this complaint to Ms. Hamilton following a February 5, 2016, telephone conversation that he had with Detective Gutwill," and that Framingham's Town Counsel had documented the complaint in a letter to Gutwill dated February 16, 2016. Id. at 1.[4]

Moore's retention letter noted further that she has spoken with Gutwill's attorneys, that "the earliest they are available is" March 3, 2016, that she would commence interviews on that date by meeting first with Gutwill and would then interview others, and that in the interim, she would review documents provided and outline issues. Id. at 5.

On March 2, 2016, Gutwill received a Notice of Investigation from Chief Ferguson advising him that an "independent/outside investigation [would] be conducted" regarding whether Gutwill committed misconduct and violated Rule 1.02 (Conduct Unbecoming a Police Officer) of the "Rules and Regulations for the Government of the Framingham, Massachusetts Police Department," Defs.' SOF, Ex. DD [#95-30], on the February 5, 2016, phone call with

---

[4] The parties have not identified the February 16, 2016, letter to Gutwill in the summary judgment record.

Chief Ferguson. Defs.' SOF, Ex. Y ("Notice of Investigation") [#95-25]. Specifically, the Notice identified that an investigation would be conducted regarding statements Gutwill allegedly made on the February 5, 2016, call that Slattery was untruthful in a case, that Brandolini was recorded on a wire tap, and that Gutwill was going to "turn the place upside down." Notice of Investigation 1 [#95-25].

Moore issued her first report on July 15, 2016. Defs.' SOF, Ex. W ("First Moore Report") [#95-23]; Defs.' SOF, Ex. X ("Executive Summary Report") [#95-24]. The report concluded that Gutwill's claims of retaliation lack merit but that Gutwill "raised his concerns in good faith." First Moore Report 179 [#95-23].

Moore issued her second report on August 15, 2016. Defs.' SOF ¶ 102 [#95]; Defs.' SOF, Ex. Z (Second Moore Report) [#95-26]. In her second report, Moore noted that Riley recalled that in his February 4, 2016, phone call with Gutwill, Gutwill had stated "You know me, Sean. I leave places in shambles," and said words to the effect of "I'm going to leave it in shambles. Like a tornado. Upside down." Second Moore Report 11 [#95-26]. Moore found that the same day, Riley reported this call to Chief Ferguson. Id. Moore reported further that while Gutwill denied making a statement to Riley about leaving the place in shambles, he admits to saying "I know how this ends, Sean. . . . It ends with a trail of destruction where nobody wins." Id. at 12.

Moore concluded, on a preponderance of the evidence standard, that Gutwill stated to Chief Ferguson that "he was going to 'turn the place upside down' or 'blow the place up,'" as Chief Ferguson had alleged. Id. at 1, 8. She also noted that she "under[stood] the circumstances surrounding" Gutwill's statement, and that Gutwill felt "that his integrity was in jeopardy by a confluence of factors that were out of his control," but concluded that these reasons did not

excuse making the "inflammatory statement" or failing to admit during the investigation to having made the statement. Id. at 14.

F.    *Gutwill's Placement on Paid Administrative Leave*

On August 19, 2016, following Moore's second report, Gutwill was placed on paid administrative leave. Defs.' SOF, Ex. AA ("Notice of Suspension of Police Powers") 1 [#95-27]. The Notice stated that the action was taken based on Moore's determination that Gutwill was untruthful during her investigation in denying the statement to Chief Ferguson that Gutwill "threatened to 'blow the place up,' 'turn it upside down,' or something to that effect." Id. Gutwill remained on paid administrative leave through December 11, 2016. See Defs.' SOF, Ex. CC ("Notice of Suspension") [#95-29].

G.    *The Third Investigative Report*

On September 15, 2016, Moore issued her investigative report regarding the allegation that Gutwill had stated that Brandolini was recorded on a federal wiretap. Defs.' SOF, Ex. BB ("Third Moore Report") 1 [#95-28]. In this report, Moore stated that Gutwill had been untruthful during the investigation when he denied stating that Brandolini had been recorded on a federal wiretap. She concluded that Gutwill violated FPD policies in two respects: "(1) by making the comment to [Chief Ferguson] on February 5 about Brandolini being 'on a wire' and failing to be honest and forthcoming in this investigation with regard to what he said; and (2) failing to be honest in this investigation about having disclosed to Brandolini several years ago that his name had come up on a wire." Third Moore Report 28 [#95-28].

H.    *The Filing of the Complaint*

Gutwill filed his Complaint [#1] on October 28, 2016. The Complaint [#1] alleges retaliation under 42 U.S.C. § 1983 against Chief Ferguson in his individual capacity (Count I)

and against the City (Count II). Count III alleges a violation of Mass. Gen. Laws ch. 149,

§ 185(b)(1), the Massachusetts Whistleblower Statute.

I.     *The Suspension and Subsequent Proceedings*

Chief Ferguson issued a "Notice of Suspension" on December 12, 2016, notifying

Gutwill that he would be suspended without pay for five days effective immediately, including

December 12, and that he was to report back for duty on December 19, 2016. Notice of

Suspension [#95-29]. The Notice of Suspension specified that Gutwill was being disciplined for

violating Rule 4.7 (Truthfulness) because he "falsely denied" making statements threatening "to

blow the place up,' 'turn it upside down,' or something to that effect," and about Deputy Chief

Brandolini having been on a wiretap, on the February 5, 2016, call with Chief Ferguson. Id. at 1.

Gutwill was also disciplined for violating Rule 1.02 (Conduct Unbecoming a Police Officer) for

having made the underlying comments. Id. at 2.

Gutwill was assigned to work in the patrol division of the FPD following his suspension.

Defs.' SOF ¶ 112 [#95]. Gutwill appealed the five-day suspension pursuant to applicable civil

service laws. Defs.' SOF, Ex. EE ("Letter Regarding Appeal") [#95-31]. Framingham Hearing

Officer Steven Torres heard the appeal on May 31, 2017, and June 16, 2017. Defs.' SOF ¶ 115

[#95]; Defs.' SOF, Ex. U ("Hr'g Tr., May 31, 2017") [#95-21]; Defs.' SOF, Ex. FF ("Hr'g Tr.,

June 16, 2017") [#95-32]. The Hearing Officer issued a decision on September 5, 2017,

sustaining Chief Ferguson's issuance of a 5-day suspension. Defs.' SOF, Ex. GG ("Hr'g

Officer's Decision") [#95-33].

On January 17, 2017, Gutwill withdrew his Civil Service Appeal of this five-day

suspension to "pursue his pending claims against [Framingham] in the United States District

Court that were filed prior to the imposition of this discipline." Defs.' SOF ¶ 120 [#95]; Defs.'

SOF, Ex. HH ("Withdrawal Letter") 2 [#95-34].[5]

III.    Standard

Under Rule 56, summary judgment is appropriate when "the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a

reasonable jury could resolve the point in favor of the non-moving party . . . [and] [a] fact is

material if it has the potential of determining the outcome of the litigation." Baker v. St. Paul

Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012) (internal citation omitted). When reviewing a

motion for summary judgment, the court must take all properly supported evidence in the light

most favorable to the non-movant and draw all reasonable inferences in the nonmovant's favor.

Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). The court properly "give[s] no heed to

speculative, unsupported, or unreasonable conclusions." Showtime Entm't, LLC v. Town of

Mendon, 769 F.3d 61, 69 (1st Cir. 2014).

IV.    Discussion

A.    *Claims Brought Under 42 U.S.C. § 1983*

Gutwill alleges § 1983 retaliation claims against Chief Ferguson in his individual

capacity (Count I) and against Framingham (Count II), asserting that three adverse actions were

imposed in retaliation for his protected speech.

To assert a claim for retaliation under 42 U.S.C. § 1983, a public-sector employee must

show that he was speaking as a citizen "on a matter of public concern." Delaney v. Town of

_____

[5] Although Plaintiff never formally moved to amend his complaint following the imposition of
the suspension, the parties agree that the suit challenges that five-day suspension.

Abington, 890 F.3d 1, 5 (1st Cir. 2018) (quoting Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007)). The employee must also demonstrate that the "protected expression was a substantial or motivating factor in the adverse employment decision." Id. at 5 (quoting Curran, 509 F.3d at 45). However, even if the plaintiff succeeds on those three factors, the defendant may prevail by showing "that [the employer] would have reached the same decision even absent the protected conduct." Decotiis v. Whittemore, 635 F.3d 22, 30 (1st Cir. 2011) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)); see also Rodriguez-Garcia v. Miranda-Marin, 610 F.3d 756, 765-66 (1st Cir. 2010) ("[T]he employer may avoid liability by showing that it would have reached the same decision even absent the protected conduct. This is the so-called Mt. Healthy defense.").

Defendants contend that Gutwill did not engage in protected speech, that some of the actions that Gutwill complains about are not cognizable as adverse actions, and that Gutwill's speech was not a substantial or motivating factor in the imposition of the actions. The court addresses these contentions in turn.

1.      Did Gutwill Engage in Protected Speech?

Gutwill contends that his complaint to the FBI, his complaint to the Town Manager, and his associated comments to Human Resources constitute protected speech. To assert that speech is protected, as a threshold matter, a plaintiff must first show that he "spoke as a citizen" and that his "speech was on a matter of public concern." Delaney, 890 F.3d at 5 (quoting Curran, 509 F.3d at 45 (1st Cir. 2007)). See also Garcetti v. Ceballos, 547 U.S. 410, 418 (2006) ("[T]he possibility of a First Amendment claim arises" when "the employee spoke as a citizen on a matter of public concern"). "Where speech relates to a matter of inherent public concern, such as official malfeasance or the neglect of duties, this inquiry is confined to the subject matter of the

speech." <u>Decotiis</u>, 635 F.3d at 30. In determining whether speech was made pursuant to official duties, courts consider non-exclusive and context-specific factors including "whether the employee was commissioned or paid to make the speech," "the subject matter of the speech, whether the speech was made up the chain of command," and whether there is a citizen analogue to the speech. <u>Id.</u> at 32.

A reasonable jury could find that Gutwill's complaint to the FBI related to matters of public concern, because it raised issues such as "official malfeasance, abuse of office, and neglect of duties." <u>Curran</u>, 509 F.3d at 46. Although Gutwill's internal complaints, which assert that the Godino investigation was mishandled and that the mishandling of the investigation might impact Gutwill's reputation, present a closer call, the court assumes for purposes of this motion that these relate to matters of public concern, since they also put Framingham on notice of the protected activity of the FBI complaint.

The court next determines whether Gutwill's speech, under <u>Garcetti</u>, was made in his capacity as a private citizen. 547 U.S. at 421-22. "In identifying [Gutwill's] official responsibilities, the proper inquiry is 'practical' rather than formal, focusing on the 'duties an employee actually is expected to perform,' and not merely those formally listed in the employee's job description." <u>Decotiis</u>, 635 F.3d at 31 (quoting <u>Garcetti</u>, 547 U.S. at 424-25). The court also considers the context of the speech. <u>Id.</u> at 32. Gutwill worked as a narcotics detective around the time he complained about the Godino testimony and about corruption within the Narcotics Unit. Gutwill was not directed by supervisors to make reports, nor was reviewing testimony or reporting internal corruption a task to which he was assigned. <u>Cf.</u> <u>Garcetti</u>, 547 U.S. at 421 (holding that the "controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy."). Accordingly, a jury could find that Gutwill was not

acting in the scope of his official duties by making the report. <u>See</u> <u>Decotiis</u>, 635 F.3d at 33

("Nothing in <u>Garcetti</u> or the decisions interpreting it can fairly be read to suggest that all speech

tangentially or broadly relating to the work of a public employee is per se unprotected.").

Because Gutwill has proffered facts such that a reasonable jury could find that he

engaged in protected speech as a private citizen for the purpose of a § 1983 retaliation claim,

Defendants are not entitled to summary judgment based on this element of the claim.

2.      Was Gutwill Subjected to Adverse Employment Actions?

An action constitutes an adverse employment action for the purpose of a First

Amendment retaliation claim when "an employer's acts, viewed objectively, . . . would have a

chilling effect on the employee's exercise of First Amendment rights." <u>Barton v. Clancy</u>, 632

F.3d 9, 29 (1st Cir. 2011). Here, Gutwill asserts that he experienced three adverse employment

actions: (1) two investigations against him; (2) placement on administrative leave; and (3) a five-

day suspension.[6] For the purposes of this motion, Defendants do not dispute that Gutwill's five-

day suspension constitutes an adverse action but contends that the investigations and placement

on administrative leave do not amount to adverse actions.

"[T]he standard for showing an adverse employment action is lower in the First

Amendment retaliation context than it is in other contexts (such as Title VII [discrimination

claims]) . . . ." <u>Rivera-Jimenez v. Pierluisi</u>, 362 F.3d 87, 94 (1st Cir. 2004) (internal citations

omitted). "Even 'relatively minor events' can give rise to § 1983 liability so long as the

---

[6] At the hearing on the motions for summary judgment, Gutwill asserted that he also experienced workplace harassment. However, Gutwill failed to assert this as an adverse action in his complaint, or to identify it in his Responses to Defendant Town of Framingham's First Set of Interrogatories. Defs.' SOF, Ex. D ("Interrogatory No. 9") [#95-4].

harassment is not so trivial that it would not deter an ordinary employee in the exercise of his or her First Amendment rights." Barton, 632 F.3d at 29 (internal citations omitted).

Thus, the court must consider whether a reasonable person would be deterred by the threat of an investigation from exercising his First Amendment rights. See Coszalter v. City of Salem, 320 F.3d 968, 975 (9th Cir. 2003) ("Various kinds of employment actions may have an impermissible chilling effect. Depending on the circumstances, even minor acts of retaliation can infringe on an employee's First Amendment rights") (internal citation omitted). The court finds that a jury could properly conclude that an in-depth investigation would deter a reasonable person from First Amendment activity. A person is unlikely to risk having his or her conduct scrutinized to an extent that other employees are not subjected to, and if faced with that threat, is instead likely to choose to remain silent. See Rivera-Jimenez, 362 F.3d at 94–95 (finding that Plaintiff, who alleged she was subjected to, "among other things, internal investigation . . . alleged sufficiently adverse employment actions to underpin a claim of impermissible retaliation").[7]

Gutwill has also presented facts from which a jury could find that Gutwill's placement on paid administrative leave is an adverse action because it "would have a chilling effect on [Plaintiff's] exercise of First Amendment rights." Barton, 632 F.3d at 29. As part of his

---

[7] Gutwill argues further that the investigations against him are adverse actions specifically because they were conducted by an external investigator. See Plaintiff's Opposition to the City of Framingham's Motion for Summary Judgement ("Pl.'s Opp'n") 2-3, 5, 9 [#128]. Gutwill has not shown why the use of an outside investigator is more likely to dissuade an employee from engaging in protected speech than an internal investigation. See McGunigle v. City of Quincy, 835 F.3d 192, 204 (1st Cir. 2016) ( "[T]he adverse employment action inquiry in the section 1983 context focuses on whether an employer's acts, viewed objectively, place substantial pressure on the employee's political views . . . .") (internal citations and quotation marks omitted).

placement on paid administrative leave, Gutwill's badge and department-issued weapons were removed, and his access to non-public areas of the FPD was revoked. Notice of Suspension of Police Powers 1 [#95-27]. Even if Gutwill was compensated for his time on leave, the social impact of and restrictions imposed by his placement on leave could be construed as deterring a reasonable person from engaging in protected speech. See Barton, 632 F.3d at 29 ("[R]etaliatory harassment . . . including denial of special benefits and assignments, was sufficiently adverse to form basis for First Amendment claim).

3.     Was Gutwill's Protected Speech a Substantial or Motivating Factor in Defendants' Imposition of Any of the Adverse Actions?

The plaintiff must also demonstrate that the "protected expression was a substantial or motivating factor in the adverse employment decision." Delaney, 890 F.3d at 6 (quoting Curran, 509 F.3d at 45). To show that the adverse action is causally related to the protected speech, the plaintiff must provide facts that "link[] his employer's adverse employment actions to his protected conduct." McGunigle v. City of Quincy, 835 F.3d 192, 203 (1st Cir. 2016). Even if a plaintiff can establish that the employer's actions were motivated by retaliatory animus, employers can prevail by showing that the "protected conduct was not the 'but for' cause of the adverse action," Rodriguez-Garcia v, Miranda-Marin, 610 F.3d 756, 767 (1st Cir. 2010) (quoting Rodriguez-Marin v. Rivera-Gonzalez, 438 F.3d 72, 81 (1st Cir. 2006)), and that the employer "would have reached the same decision even absent the protected conduct." Id. (citing Mt. Healthy, 429 U.S. at 287). See also Guilloty Perez v. Pierluisi, 339 F.3d 43, 51 (1st Cir. 2003) ("If the employee makes an adequate showing [of a substantial and motivating factor], the defendants must counter by proving by a preponderance of the evidence that the governmental agency would have taken the same action against the employee even in the absence of the protected conduct") (internal citations omitted); Padilla-Garcia v. Guillermo Rodriguez, 212 F.3d

69, 77-78 (1st Cir. 2000) (applying Mt. Healthy defense to context of First Amendment retaliation claims). Here, Gutwill has failed to proffer sufficient evidence to support a finding that his protected speech was a significant and motivating factor in any of the adverse employment actions. Gutwill's claims further fail because Defendants have shown that the FPD would have reached the same decision even absent Gutwill's protected speech. The court addresses each adverse action in turn.

a.    *Investigations*

Defendants assert that Chief Ferguson initiated the investigations after Gutwill made statements to Chief Ferguson and others in the department about "blow[ing] the place up." Typed Notes from Feb. 5 Call 6 [#95-20]; Notice of Investigation [#95-25]. Accepting Gutwill's version of events, Gutwill made statements to Chief Ferguson about a "wake of destruction" within the department. Defs.' Ex., Gutwill Dep. 451:7-9 [#95-1]; Revised Pl.'s SAMF ¶ 124 [#129]. The record also reflects that Gutwill made similar statements to Riley and that Riley relayed these to Chief Ferguson. Riley Notes [#111-18]; Second Moore Report 11 [#95-26]. Even assuming that Chief Ferguson was mistaken about the exact comments that Gutwill made, Gutwill has not proffered evidence from which a jury could discount Chief Ferguson's understanding that Gutwill had made threatening comments. Under these circumstances, there is insufficient evidence for a jury to infer that Gutwill's "protected expression was a substantial or motivating factor in the adverse employment decision[s]." Delaney, 890 F.3d at 6 (quoting Curran, 509 F.3d at 45).

Moreover, by proffering evidence of Chief Ferguson's cause for initiating the investigations, Defendants have "met their burden to show that they would have taken the same adverse employment actions regardless of [Gutwill's] . . . speech." McGunigle, 835 F.3d at 205

(1st Cir. 2016). Gutwill has failed to "discredit the proffered [non-retaliatory] reason . . ." by developing evidence of relevant comparators or of the department's inconsistent use of investigations that rebuts Defendants' stated intent for initiating investigations. Cepero-Rivera v. Fagundo, 414 F.3d 124, 133 (1st Cir. 2005). Accordingly, Defendants are entitled to summary judgment as to the claim that the initiation of the investigation was retaliatory.

b.    *Paid Administrative Leave*

Defendants have proffered evidence that the decision to place Gutwill on paid administrative leave was made in response to Moore's finding that Gutwill had made untruthful statements in the course of Moore's investigation. See Notice of Suspension of Police Powers 2 [#95-27] (citing the results of Moore's investigation as the basis for placing Gutwill on administrative leave). Gutwill contends that Moore's conclusions were faulty and that he was not dishonest, and that Moore was not a truly neutral party because she was paid by Framingham. But even if Gutwill can establish that Moore's finding were incorrect, he has not proffered evidence from which a jury could find that Moore made these findings because of his protected activities or that Defendants were motivated by animus in accepting her conclusions.

c.    *Suspension*

There is also insufficient evidence of a causal link between the protected speech and the suspension. Moore's investigation concluded that Gutwill had made untruthful statements to Moore and that these statements amounted to a violation of Rules 4.7 (Truthfulness) and 1.02 (Conduct Unbecoming a Police Officer). Notice of Suspension 2 [#95-29]. Chief Ferguson imposed a five-day suspension based on Moore's finding. Id. Furthermore, after Chief Ferguson imposed the penalty, a Hearing Officer reviewed Moore's findings and Chief Ferguson's imposition of a suspension, and concluded that because "the Department could have sustained a

penalty as severe as termination," the Hearing Officer would not "disturb the Chief's decision to impose only a five-day suspension . . . ." Hr'g Officer's Decision 10 [#95-33]. Gutwill fails to proffer any evidence from which a jury could infer that the Hearing Officer's conclusion that Gutwill received a reasonable discipline, given the evidence before the Hearing Officer, was unreasonable or substantially motivated by animus. Nor does Gutwill identify any individuals who received similar disciplinary findings, such that a jury could infer that the discipline Gutwill received was more severe because of his protected activity.

Accordingly, on this record, no reasonable jury could find that Framingham's decision to impose a five-day suspension, after a disciplinary process concluded Gutwill violated department policy, was substantially motivated by retaliatory animus. Even if a jury could make that finding, Defendants have carried their burden of showing they would have suspended Gutwill for this conduct even if he had not engaged in protected speech.

For the reasons stated above, the court finds that Chief Ferguson and Framingham are entitled to judgment as a matter of law as to claims asserted by Gutwill under § 1983.[8]

B.    *Claims Brought Under Mass. Gen. Laws ch. 149, § 185*

Under the Massachusetts Whistleblower Act ("MWA"), an employee has a private right of action against a public employer if the employer takes retaliatory action against the employee for engaging in protected activities. "In order to prevail on a claim under the whistleblower statute, a plaintiff must show that he engaged in protected activity and that his participation in that activity played a substantial or motivating part in the retaliatory action." Welch v. Ciampa, 542 F.3d 927, 943 (1st Cir. 2008) (citing Larch v. Mansfield Mun. Elec. Dep't, 272 F.3d 63, 67

---

[8] Defendant Chief Ferguson also asserts that he is protected by qualified immunity. The court does not reach this issue.

(1st Cir. 2001)). Retaliatory action "include[s] discharge, suspension, demotion, or any other action that adversely affects the terms and conditions of the employment." <u>Bennett v. City of Holyoke</u>, 362 F.3d 1, 5 (1st Cir. 2004) (citing Mass. Gen. Laws ch. 149, § 185(a)(5)).

Gutwill's MWA claim fails for the same reasons as his § 1983 claims. Gutwill has failed to proffer evidence from which a jury could find that the adverse actions against him were substantially motivated by retaliatory animus, and even if a jury could so find, Gutwill has failed to proffer evidence to rebut Defendants' showing that Gutwill's protected acts were not the "but-for" cause of the adverse actions.[9]

IV.    <u>Conclusion</u>

The summary judgment record here supports Gutwill's claims that he originally sought to raise serious matters of public concern, and that the officers assigned by Chief Ferguson to investigate his concerns found that Gutwill made his reports in good faith. To avoid summary judgment here, however, Gutwill had to proffer evidence from which a jury could find that this protected speech was the substantial or motivating factor in the adverse actions he suffered. Gutwill has not made this showing. The court GRANTS Defendant Framingham's <u>Motion for Summary Judgment</u> [#91] and Defendant Ferguson's <u>Motion for Summary Judgment</u> [#93].

IT IS SO ORDERED.

Date: January 22, 2020                             /s/ Indira Talwani
                                                   United States District Judge

---

[9] Framingham also argues that Gutwill failed to provide the requisite prior written notice to bring a claim under the Massachusetts Whistleblower Statute. Because the court finds that Gutwill's claim fails on other grounds, the court does not address whether Gutwill properly provided notice of his intent to pursue a claim.